**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **OJOMA ACHENEJE,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civ. No. MJM-25-1126** |
| | * | |
| **UNIVERSITY OF MARYLAND MEDICAL SYSTEM CORPORATION, et al.,** | * | |
| | * | |
| | * | |
| **Defendants.** | * | |

* * * * * * * * * * *

**MEMORANDUM OPINION**

Plaintiff Ojoma Acheneje ("Plaintiff") commenced this civil action against the University of Maryland Medical System Corporation ("UMMS"), Upper Chesapeake Medical Center, Inc. ("UCMC"), University of Maryland Upper Chesapeake Health System, Inc. ("UCHS"), and Harford Memorial Hospital, Inc. (collectively, "Defendants"), alleging discrimination, retaliation, unlawful discharge, and breach of contract in connection with her termination from employment as a clinical nurse at Harford Memorial Hospital ("HMH") on October 31, 2023. This matter is before the Court on Defendants' Motion for Summary Judgment. ECF 27. Plaintiff filed a memorandum in opposition to the motion, ECF 28, and Defendants filed a reply memorandum, ECF 29. A hearing is not necessary to resolve the motion. Loc. R. 105.6 (D. Md. 2025). For the reasons explained below, Defendants' motion will be granted, and summary judgment will be entered in their favor.

## I. BACKGROUND

Plaintiff is an African American female of Nigerian national origin. ECF 1 ¶ 4; ECF 8 ¶ 4. Between July 2019 and October 31, 2025, Plaintiff was employed by Defendants as a Registered

Nurse and worked in the Behavioral Health Unit ("BHU") at HMH.[1] *Id.* As a student in the Doctor of Nursing Practice ("DNP") program at the University of Maryland School of Nursing, Plaintiff had approval to collect data from the BHU outside of working hours, toward completion of her DNP program. ECF 28-5. She was also a member of the United States Air Force Reserves throughout the period of employment. ECF 28-2 at 35–36.

**A. October 2019**

On October 30, 2019, as a new graduate nurse resident, Plaintiff was placed on an Education Plan per routine policy. ECF 28-2 at 61:19–20. Under "Performance Goals and Objectives," the Education Plan states that Plaintiff "will develop positive communication skills with her patients and fellow team members" and "will continue to develop positive verbal and non-verbal communication skills with team members and the patients under her care by improving on situational awareness and preceptor feedback." ECF 28-6. Under "Individual Objectives," which Plaintiff identified, the Education Plan states, "Be more open with communication and be able to articulate challenges in a positive way." *Id.* During her deposition in this matter, Plaintiff testified that, while discussing the Education Plan with her supervisor and members of Human Resources ("HR") in 2019, she was told "that I needed to work on . . . how I speak, like my English or something like that, like communication because of my accent." ECF 28-2 at 62:16–19. When asked to elaborate about what specifically was said to her, Plaintiff testified that she was told "I should just communicate more with the staff. Like, you know, just socialize more. . . . I said maybe I'm conscious, you know, of my accent. Maybe that's why I don't really speak more. I just sit and I'm quiet. They're like, No, you need to work on that, you know, communicate more and all." *Id.* at 65:16–66:4.

[1] Harford Memorial Hospital, Inc. was a subsidiary of UCHS/UMMS Venture, LLC, which in turn is a subsidiary of, and is operated by, UCHS. ECF 27-3 ¶¶ 2, 4.

**B. October 2021**

On October 4, 2021, Plaintiff reported "several incidents of harassment, intimidation, and aggression in the workplace" by another African American employee, Tanet Washington. ECF 28-8; ECF 27-9. Another employee also reported an incident where Ms. Washington "intentionally shouldered" Plaintiff, "tried to provoke [Plaintiff] with statements," and "continued to be aggressive in tone and words." ECF 28-10. Both Plaintiff and Ms. Washington were "reprimanded," ECF 28-2 at 146:18, and Ms. Washington "did not face any repercussion." *Id.* at 149:5–6.

**C. September 2023**

On September 16, 2023, Plaintiff was working an overnight shift. ECF 1 ¶ 18. As the Charge Nurse, she was "responsible for overseeing [her] unit, assigning duties, and assisting other nurses." ECF 27-7 ¶ 7. During this shift, two rapid responses were called, ECF 28-2 at 87:16–18, which occur "when a patient demonstrates signs of imminent clinical deterioration," ECF 27-7 ¶ 10. According to HMH Administrative Coordinator Robert Dodsworth, Charge Nurses should "respond to a rapid response as soon as possible, no matter what the Charge Nurse is doing, and without being asked." *Id.* ¶ 12.

During and around the time of the two rapid responses, Plaintiff had a verbal interaction or altercation with another nurse, Gabrielle Spalt, and the two nurses have differing accounts of their encounter. When the first rapid response was called, Plaintiff went to the nurse responsible for the patient, Annette Burrage-Reese, to ask if she needed help, and she told Plaintiff that no help was necessary and to return to the nurse station. ECF 28-2 at 87:17–88:14; ECF 28-11 at 16:1–17:5. Plaintiff testified that she was "doing [her] charge nurse duties[,]" like serving snacks to patients, helping another nurse, Lawrence Afah, and answering the phone. ECF 28-2 at 93:14–94:20.

According to Plaintiff, Ms. Spalt asked Plaintiff to help Mr. Afah, and, while Plaintiff was helping him, Ms. Spalt returned and "started yelling" and "pointing at" her. ECF 28-2 at 99:8–10; ECF 28-12 ¶ 7, 9. Ms. Spalt "yelled" at Plaintiff, "Stop being on your phone and do your job; that is how you people act, instead of just doing what you are paid for, you are on the phone, there's a rapid going on." ECF 27-18; ECF 28-2 at 322:13–323:8. In an affidavit, Mr. Afah describes Ms. Spalt's comment to Plaintiff as "words to the effect of: 'There's a code, everybody is helping, you are not here to help, you are sitting there on your phone.'" ECF 28-12 ¶¶ 8–9.

Ms. Spalt claims to have observed Plaintiff at the nurse station on a "personal FaceTime call." ECF 27-17; ECF 27-12 at 21:1–6. Ms. Spalt asked Plaintiff to hang up and help with the rapid response, and, according to Ms. Spalt, Plaintiff did not hang up and said that she was "too busy." ECF 27-17; ECF 27-12 at 21:1–6. Ms. Spalt returned to the patient room with the ongoing rapid response, where Ms. Burrage-Reese and Mr. Dodsworth were, and told them that Plaintiff was on a personal call during the rapid response. ECF 27-17; ECF 27-12 at 21:6–13; ECF 28-11 at 21:10–22:7.

Plaintiff testified that she made "a quick call" to her children at some point during the rapid responses, but she "was never on FaceTime." ECF 28-2 at 90:2–92:6. Mr. Afah stated in an affidavit that he "did not observe [Plaintiff] on her personal cell phone during any rapid responses or any time that night." ECF 28-12 ¶ 8. But another nurse working that night, Nanette Gebhardt-Kram, observed Plaintiff "conversing with someone on FaceTime" about buying a house during the rapid responses. ECF 27-14. Mr. Dodsworth also witnessed Plaintiff "on her phone" talking with someone when he returned to the nurse's station "at the start of the first rapid" and again a few minutes later, after the second rapid response began. ECF 28-15 at 16:9–17, 17:17–18:4.

When the second rapid response was called, Ms. Burrage-Reese requested that Ms. Spalt ask Plaintiff to come to the room because another nurse was asking for the Charge Nurse. ECF 27-10 at 22:18–21; ECF 27-17; ECF 27-12. According to Ms. Spalt, Plaintiff hung up her personal call and participated in patient care. ECF 27-17; ECF 27-12 at 21:21–22:2. Plaintiff asked to speak with Ms. Spalt privately. ECF 28-2 at 121:2–122:8. Ms. Spalt declined to do so because she believed that Plaintiff "approached aggressively" and that "upper management needed to be involved." ECF 27-17; ECF 28-14 at 52:18–53:4. According to Ms. Spalt, she told Plaintiff that she would speak with Plaintiff with a manager present after the rapid response was over, and Plaintiff insisted on speaking immediately, stating, "If you're going to be racist, go somewhere else with that shit, is it because I'm an African American woman," ECF 27-17; ECF 28-14 at 71:4–11. According to Plaintiff, Ms. Spalt told Plaintiff that she felt "unsafe," and Plaintiff told Ms. Spalt "that her behaviors and comments have a racist undertone." ECF 28-17; ECF 28-2 at 132:8–11.

After speaking with Ms. Spalt and Plaintiff, as well as a student who was present and Ms. Gebhardt-Kram, Mr. Dodsworth decided to send Plaintiff home on administrative suspension, pending an investigation. ECF 28-15 at 33:14–21, 35:7–12; ECF 27-25. Plaintiff reported her account of Ms. Spalt's comments to HR. ECF 28-17; ECF 28-18.

The ensuing investigation included "interviews of all staff working that shift" and "review of video." ECF 27-21; ECF 28-23 at 21:3–11, 23:6–9; *see also* ECF 27-15 ¶¶ 14–15. According to UCHS HR Business Partner Susanne Canavan, during a meeting on September 21, 2023, Plaintiff admitted that she was on FaceTime with her children during the events of September 16. ECF 27-15 ¶ 16. After the investigation, Ms. Canavan determined that Plaintiff made a personal phone call during the rapid response, but she was unable to substantiate Plaintiff's report of racially

charged comments by Ms. Spalt and Ms. Spalt's report about Plaintiff's comments. *Id.* ¶ 17; ECF 27-21. Based on the results of the investigation, Plaintiff received a final written warning for inattention to patient care. ECF 27-15 ¶ 18; ECF 27-27.

**D. October 2023**

On October 18, 2023, Plaintiff sent an e-mail to her supervisor, Claire Kidwell, stating that she would be on a one-week mandatory military deployment and unavailable to cover her scheduled work shifts. ECF 28-28 at 7. Plaintiff's military orders specified that the activity duty order was from October 14 to October 20. ECF 28-29. On October 19, Ms. Kidwell instructed Plaintiff to call the Administrative Coordinator to request time off. ECF 28-28 at 6. On the same date, Plaintiff noted to Ms. Kidwell that she was still scheduled to work on October 21, but she was "on orders until [that date]." ECF 28-28 at 5. On October 21, at around 1:00 p.m., Plaintiff contacted Administrative Coordinator Barbara Baughman to call out of her shift, which was scheduled to begin at 7:00 p.m. that evening. ECF 28-2 at 204:16–206:17; ECF 27-37 at 19. Ms. Baughman told Plaintiff to send her documentation to HR, and she would remove Plaintiff from the shift. *Id.*

At some point, Plaintiff called the BHU to advise that she was coming in for her DNP project that evening. ECF 28-2 at 208:10–13. When Ms. Baughman learned that Plaintiff was planning on coming to the BHU, she left Plaintiff a voicemail telling her not to come in. ECF 27-37 at 19:11–14. Plaintiff did not see the voicemail, went to the BHU to conduct her DNP project, and was told to leave upon arriving. ECF 28-2 at 208:20–209:13. When Ms. Baughman was notified that Plaintiff was on the unit, she went to speak with Plaintiff and told her she "did not feel it was appropriate [for Plaintiff] to do other work on the unit if [she was] unable to work any part of [her] shift[,]" and that "she would need to come another day to complete her school assignment." ECF 27-37 at 19:17–21. With Plaintiff's absence from work, the BHU was short-

staffed that evening, which posed safety risks and stressful conditions on the team working there. ECF 27-35 at 96:13–16. According to Ms. Baughman, "Plaintiff did not refuse but heavily debated" leaving the unit, arguing that she should be permitted to stay because her absence from work was excused by military mandate. ECF 27-37 at 19:21–20:2.

In subsequent e-mails with Plaintiff, Ms. Kidwell requested an "updated" letter from the military reflecting that her active duty extended to October 21, pointing out that the letter Plaintiff sent her reflected deployment through October 20. ECF 28-28 at 4; *see also* ECF 28-29. Plaintiff responded that her "order ended on the 20th and [Ms. Kidwell was] not taking into account [Plaintiff's] travel time[.]" ECF 28-28 at 4. Plaintiff's military orders were later modified to include October 21. ECF 28-31; ECF 28-32.

On October 31, 2023, Plaintiff was issued a disciplinary action for the events of October 21 and was terminated from her position. ECF 28-36. The stated reasons for her firing were that she received two final written warnings within a year, apparently referring to the October 2023 disciplinary action as the second of the two. ECF 28-24; *see also* ECF 27-44 at 3. Plaintiff received a first final written warning for "[i]nattention to [p]atient [c]are" stemming from the events of September 28, 2023. ECF 27-27; *see also* ECF 27-15 ¶¶ 17–18; ECF 28-24. She received a second discipline for "[d]eliberate misrepresentation of work-related matters" on October 21, 2023, because she called out of work claiming that she was on military duty and unable to work, but she was able to come to the unit to interview staff as part of a school project. ECF 27-41; *see also* ECF 27-15 ¶¶ 21–24; ECF 28-24.

**E. Procedural History**

On March 8, 2024, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on race and retaliation. ECF

27-45. About one year later, she received a Notice of the Right to Sue from the EEOC. ECF 27-46.

On April 4, 2024, Plaintiff filed suit against Defendants, alleging discrimination under Title VII of the Civil Rights Act ("Title VII") and the Maryland Fair Employment Practices Act ("MFEPA"), retaliation under Title VII and MFEPA, unlawful discharge and discrimination under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), and breach of contract. ECF 1. Following discovery, Defendants moved for summary judgment on all counts. ECF 27. The motion is fully briefed and ripe for disposition.

## II. STANDARD OF REVIEW

A court may grant a party's summary judgment motion under Rule 56 if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020). A fact is "material" if it "might affect the outcome of the suit under the governing law[,]" and a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986) (emphasis removed); *see also Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016). A party can establish the absence or presence of a genuinely disputed fact through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The court must view all the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmovant, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), but the court may not weigh the

evidence, make credibility determinations, or decide the truth of disputed facts, *Anderson*, 477 U.S. at 249.

"The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Med. Mut. Ins. Co. of N.C. v. Gnik*, 93 F.4th 192, 200 (4th Cir. 2024) (citing *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003)). The burden then shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." *Bouchat*, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e)).

## III. DISCUSSION

### A. Exhaustion of Administrative Remedies

Defendants argue that any events that occurred before May 13, 2023—300 days before March 8, 2024, the date Plaintiff filed a Charge of Discrimination with the EEOC—may not be considered as a basis for her Title VII discrimination claims. ECF 27-1 at 12–13. They contend that Defendants are entitled to summary judgment on any claims based on the 2019 Education Plan and the 2021 altercation with Ms. Washington. *Id.*

Plaintiff argues that although any alleged discriminatory acts prior to May 13, 2023, are not independently actionable, she may use the prior acts as background evidence to support her timely claims. ECF 28 at 12-13.

Both sides are correct. Before bringing suit under Title VII, plaintiffs alleging unlawful employment practices in Maryland must file a charge with the EEOC within 300 days of the alleged unlawful practice. *See* 42 U.S.C. § 2000e-5(e)(1); *EEOC v. Hansa Products, Inc.*, 844 F.2d 191, 192–93 (4th Cir. 1988). Plaintiffs may not recover for discrete discriminatory practices that occur outside of the 300-day period. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002). However, employees may present evidence of acts that occurred before the 300-

day period "as background evidence in support of a timely claim." *Id.* at 113; *see also Membreno v. Atlanta Rest. Partners*, 517 F. Supp. 3d 425, 437 (D. Md. 2021). Defendants are correct that Plaintiff may not recover for discrete claims of discrimination or retaliation based on incidents that occurred before May 13, 2023, including allegations related to the 2019 Education Plan and the 2021 altercation. But Plaintiff is correct that she may present these prior incidents as evidence of "discriminatory or retaliatory intent" in support of timely claims, and that the prior incidents "may be the subject of . . . evidence presented at trial." *Evans v. Md. Nat'l Cap. Parks & Plan. Comm'n*, Civ. No. TDC-19-2651, 2020 WL 6703718, at *3 (D. Md. Nov. 13, 2020). However, the above referenced events of 2019 and 2021 bear no relation to the allegedly discriminatory and retaliatory acts that occurred in September and October 2023 and fail to rescue her discrimination and retaliation claims.

**B. Discrimination Under Title VII and MFEPA**

In Counts I and II of the Complaint, Plaintiff asserts claims for race, color, and national origin discrimination in violation of Title VII and MFEPA based on disciplinary actions taken against her and the termination of her employment in September and October 2023. Defendants argue that they are entitled to summary judgment on these counts because the undisputed evidence shows that Plaintiff's job performance was unsatisfactory, ECF 27-1 at 14–15, and that any adverse action was not connected to Plaintiff's race or national origin, *id.* at 15–16. Plaintiff received a final written warning for failing to respond to a rapid response in September 2023. *Id.* at 14. Then, in October 2023, Plaintiff called out of a scheduled work shift but came to the hospital to complete a school assignment. *Id.* Although doing so would ordinarily result in a final written warning, Plaintiff was terminated because she already received a warning a month prior. *Id.* at 14–15. Defendants additionally argue that Plaintiff failed to show that similarly situated employees outside of her protected classes received more favorable treatment. *Id.* at 15–16. Plaintiff argues

that she has presented a prima facie case for discrimination under Title VII and MFEPA and that Defendants' justifications for discipline and termination are pretextual. ECF 28 at 13–20. She contends that she "consistently performed her job at a high level[.]" *Id.* at 16. She notes that Ms. Spalt was not disciplined for the September 2023 incident, supporting an inference of discrimination. *Id.* at 17–18.

Title VII provides that it is an "unlawful employment practice" for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . or national origin[.]" 42 U.S.C. § 2000e-2(a). MFEPA also prohibits employers from failing or refusing "to hire, discharg[ing], or otherwise discriminat[ing] against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment" based on "race, color, [or] national origin[.]" Md. Code Ann., State Gov't § 20-606(a). Courts use the same framework to analyze discrimination claims under Title VII and MFEPA. *See, e.g.*, *Copes v. Johns Hopkins Univ. Applied Physics Lab'y, LLC*, Civ. No. RDB-23-2306, 2025 WL 19987, at *6 (D. Md. Jan. 2, 2025) (collecting cases); *Leonhartt v. MedStart Health, Inc.*, No. 1:23-CV-01211-JRR, 2025 WL 744077, at *5 (D. Md. Mar. 7, 2025); *Watrous v. AIRtec, Inc.*, Civ. No. TJS-24-2076, 2025 WL 2494324, at *5 (D. Md. Aug. 28, 2025) (citing *Passwaters v. Wicomico Cnty.*, Civ. No. RDB-18-2923, 2019 WL 6341623, at *25 (D. Md. Nov. 27, 2019)).

A plaintiff in an employment discrimination case may defeat summary judgment either through "direct or indirect" evidence of discriminatory intent under "ordinary principles of proof[,]" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997), or through the burden-shifting framework outlined by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973). *See Haynes v.*

*Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019). ("Where, as here, a plaintiff does not allege direct evidence of discrimination, a plaintiff asserting discriminatory treatment under Title VII may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas* . . . ."); *Rodgers v. Eagle All.*, 586 F. Supp. 3d 398, 433–34 (D. Md. 2022).

Under the three-step *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of discrimination. *Abilt v. CIA*, 848 F.3d 305, 315 (4th Cir. 2017). To establish a prima facie case of discrimination under Title VII, a plaintiff must show (1) membership in a protected class; (2) an adverse employment action by the employer; (3) satisfactory job performance at the time of the adverse employment action; and (4) that the adverse employment action occurred "under circumstances giving rise to an inference of unlawful discrimination." *Jones v. Constellation Energy Projects & Servs. Grp., Inc.*, 629 F. App'x 466, 468 (4th Cir. 2015) (quoting *Adams v. Tr. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011)). However, "the precise requirements of a prima facie case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 311 (2025) (citations and internal quotation marks omitted). An inference of unlawful discrimination is supported where "similarly-situated employees outside the protected class receive[] more favorable treatment." *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (citation omitted). "'[W]here a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination,' the plaintiff must demonstrate that the comparator is similarly situated in all relevant respects." *Gaines v. Balt. Police Dep't*, 657 F. Supp. 3d 708, 735 (D. Md. 2023) (quoting *Swaso*, 698 F. App'x at 748).

If a plaintiff establishes a prima facie case, a presumption of illegal discrimination arises, and the burden of production shifts to the employer to produce a legitimate, non-discriminatory

reason for its adverse action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Tx. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981). To prevail after the defendant does so, the plaintiff must prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Id.* at 256. This burden "merges with the ultimate burden of persuading the court that" the plaintiff was "the victim of intentional discrimination." *Id.* The plaintiff may do so either by "persuading the court that a discriminatory reason more likely motivated the employer" or by "showing that the employer's proffered explanation is unworthy of credence." *Id.*

Assuming without deciding that Plaintiff can establish a prima facie case of discrimination, the Court finds that Defendants have produced legitimate, non-discriminatory reasons for disciplining and terminating Plaintiff in September and October 2023. As to the September 2023 incident, Mr. Dodsworth decided to impose a paid administrative suspension of Plaintiff pending an investigation[2] after witnessing Plaintiff "at the desk not doing her job [as Charge Nurse] during two rapid responses[,]" and hearing Plaintiff's and Ms. Spalt's accounts of their altercation. ECF 27-13 at 33–34. After the investigation, a final written warning issued against Plaintiff for "[i]nattention to [p]atient [c]are" because she was using her cell phone during the rapid response events. ECF 27-15 ¶¶ 17–18; ECF 27-21; ECF 27-22; ECF 27-27. In October 2023, Plaintiff was terminated for "[d]eliberate misrepresentation of work-related matters relating to [UCHS]

[2] The Court assumes without deciding that Plaintiff's paid suspension was an adverse employment action for purposes of a Title VII and MFEPA discrimination claim. To demonstrate an adverse employment action, a plaintiff must show that the defendant employer took some action that "brought about some 'disadvantageous' change in an employment term or condition"—in other words, "some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

operations," ECF 27-41, having represented that she was unable to come into work on October 21, 2023, because she was on military duty, but showing up to work on that day regardless to gather data for a school project, ECF 27-15 ¶¶ 21–24; ECF 27-35; ECF 27-36; ECF 27-37; ECF 27-39.

Plaintiff fails to present any evidence that Defendants' reasons for disciplining and terminating her were pretextual, and the arguments for a finding of pretext are not persuasive.

First, Plaintiff argues that Defendants' justifications for disciplining and terminating Plaintiff have been inconsistent. But Defendants have consistently maintained that Plaintiff would have received a final written warning in October 2023 for deliberately misrepresenting her availability for work, but she was terminated instead because she had received another final written warning within the previous 12 months for inattention to patient care, in September 2023. *E.g.*, ECF 27-15 ¶¶ 25–26; ECF 27-41; ECF 28-24. Plaintiff points out that, in some documentation, Defendants justified the termination by citing a "2nd Final Written Warning" but "later asserted" a "misrepresentation" by Plaintiff about her military leave, and, in the support of their motion, describe Plaintiff's conduct as "egregious behavior" and "a deliberate misrepresentation of work-related matters relating to operations . . . ." ECF 28 at 10. The Court perceives no material inconsistency among these statements. Plaintiff did receive, in October 2023, a second disciplinary action within 12 months, which progressed her termination, and, according to Defendants, this second discipline was based on Plaintiff having misrepresented her availability to work on October 21, which Plaintiff did by reference to her military duty. Defendants determined that Plaintiff's unavailability was misrepresented based on the fact that Plaintiff showed up in the BHU to perform schoolwork.

Second, Plaintiff argues that Defendants' investigation was not sufficiently thorough. Importantly, an employer need not "show that it conducted a perfect investigation; rather, the

employer's decision need only be reasonably informed." *Pritchard v. Metro. Wash. Airports Auth.*, Civ. No. 1:18-cv-1432, 2019 WL 5698660, at *8 (E.D. Va. Nov. 4, 2019), *aff'd*, 860 F. App'x 825 (4th Cir. 2021) (quoting *Tomasello v. Fairfax Cnty.*, No. 1:15-cv-95, 2016 WL 165708, at *11 (E.D. Va. Jan. 13, 2016)). The investigation of the September 2023 incident included gathering witness statements from Ms. Spalt, Mr. Dodsworth, Ms. Gebhardt-Kram, and Ms. Burrage-Reese, in addition to meeting with Plaintiff. ECF 27-15 ¶¶ 14–17. Three employees working at the time—Ms. Spalt, Mr. Dodsworth, and Ms. Gebhardt-Kram—all observed Plaintiff on her phone during the rapid responses. ECF 27-12 at 21:1–6; ECF 28-15 at 16:9–17, 17:17–18:4; ECF 28-15 at 16:9–17, 17:17–18:4. Plaintiff admitted to placing a call around this time. ECF 28-2 at 90:2–92:6. And using a personal cell phone while failing to respond to rapid responses as a Charge Nurse amounts to inattention to patient care in violation of UCHS policy and warrants disciplinary action. ECF 27-15 ¶ 18. Plaintiff fails to demonstrate that Defendants' investigation of the September 2023 incident and decision to discipline Plaintiff were not reasonably informed.

Third, Plaintiff argues that Defendants mishandled video evidence. However, one of Defendants' employees reviewed the video footage of the September 2023 incident and concluded that it was "tough to see much" and that she "had a difficult time seeing anything in the nurses station." ECF 27-23. That employee did not see what Plaintiff alleged, namely that Ms. Spalt came towards Plaintiff "pointing her finger at her and yelling at her." ECF 27-24 at 63:11–14.[3]

Fourth, Plaintiff argues that Defendants' witnesses characterize Plaintiff's conduct on October 21, 2023, inconsistently. The differences in witnesses' characterizations of Plaintiff's conduct during the October 2023 incident as "belligerent and hostile," ECF 28-24, versus "argumentative," ECF 28-23 at 53, ECF 28-34 at 19–20, versus a "small incident," ECF 28-9 at

[3] Plaintiff's contention that Defendants mishandled the video footage is further addressed in Part III.F.

10, are immaterial. *See* ECF 28 at 19-20. Plaintiff was disciplined for misrepresenting her availability for a work shift and for coming into the unit during that shift to collect data for a school project, *see, e.g.*, ECF 27-15 ¶¶ 21–24, not for her temperament while on the unit. The discrepancies that Plaintiff highlights do not contradict the facts material to the disciplinary action.

Fifth, Plaintiff argues that Defendants' treatment of Ms. Spalt reinforces inferences of pretext. Defendants' decision to not discipline Ms. Spalt, a white woman, for her conduct during the September 2023 incident is not evidence that Defendants' reasons for disciplining Plaintiff are pretextual. Defendants declined to discipline either Plaintiff or Ms. Spalt for the comments that they allegedly made to each other during the incident because they were "unable to substantiate" those allegations. ECF 27-15 ¶ 17. No one else who was present during the rapid responses could corroborate Plaintiff's allegation that Ms. Spalt made discriminatory comments to Plaintiff or that Plaintiff accused Ms. Spalt of racism. *Id.* However, Defendants' investigation did reveal that Plaintiff was on her phone during the rapid responses, based on the statements of several other employees. *Id.* It is undisputed that Ms. Spalt was was not inattentive to patient care during the rapid responses.

Because there is no genuine dispute of material fact as to the veracity of the legitimate, non-discriminatory reasons produced for the disciplinary actions taken against Plaintiff and her termination, the Court will grant summary judgment in Defendants' favor on Plaintiff's Title VII and MFEPA discrimination claims.

### C. Retaliation Under Title VII and MFEPA

In Counts III and IV of the Complaint, Plaintiff alleges that Defendants retaliated against her for reporting Ms. Spalt's alleged racist remarks during the September 2023 incident, in violation of Title VII and MFEPA. Plaintiff argues that there were several adverse actions taken against her in retaliation for her complaint of discrimination—namely, her suspension after the September 2023

incident, the failure to thoroughly investigate her complaint against Ms. Spalt, the denial of her request for military leave, and the denial of access to the unit on October 21, 2023, and afterwards to collect data for her DNP project. ECF 28 at 21-23. Defendants contend that the only adverse actions taken against Plaintiff were the final written warning and termination, so they are entitled summary judgment on the other alleged adverse actions alleged to be retaliatory. ECF 27-1 at 18–21. Defendants further argue that Plaintiff fails to establish a connection between her reports about Ms. Spalt's comments and the adverse actions. *Id.* at 21–22. Plaintiff argues that she presented sufficient evidence of causation between her complaint of discrimination and the adverse actions Defendants took. ECF 28 at 23-24.

An employer may not discriminate against an employee for "oppos[ing] any practice made an unlawful employment practice" by Title VII or "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a). Similarly, MFEPA prohibits retaliation against employees for "oppos[ing] any practice prohibited by" MFEPA or "ma[king] a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" MFEPA. Md. Code Ann., State Gov't § 20-606(f). As with discrimination claims, courts adjudicate Title VII and MFEPA retaliation claims under the same standard, *see, e.g.*, *Leonhartt*, 2025 WL 744077 at *5, and may apply the *McDonnell Douglas* framework to determine liability for retaliation, *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 248–49 (4th Cir. 2015); *Rodgers*, 586 F. Supp. 3d at 445.

A prima facie case for retaliation requires a showing that (1) the plaintiff engaged in protected activity, (2) she suffered a "materially adverse" action, and (3) there was a "causal connection between the protected activity and the adverse action." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 195 (4th Cir. 2019) (citing *Burlington N. & S.F.R. Co. v. White*, 548 U.S. 53, 61–68

(2006)); *see also Rodgers*, 586 F. Supp. 3d at 445. The protected activity in question here was Plaintiff's report of Ms. Spalt's "discriminatory words and conduct" against her to Defendants. ECF 1 ¶¶ 86, 94.

An adverse action sufficient to sustain a claim of retaliation is different from that necessary to support a discrimination claim. *See Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018); *Rodgers*, 586 F. Supp. 3d at 446. The U.S. Supreme Court has recognized that Title VII's anti-retaliation provision "'extends beyond workplace-related or employment-related retaliatory acts and harm' because '[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace.'" *Strothers*, 895 F.3d at 327 (quoting *Burlington*, 548 U.S. at 63, 67). Therefore, as opposed to an adverse *employment* action for purposes of a Title VII discrimination claim, an adverse action "need not be employment- or workplace-related in order to sustain a retaliation claim." *Id.* at 327 n.3. Instead, the plaintiff must show that the adverse action was "materially adverse," meaning that the action "'might have dissuaded a reasonable worker' from engaging in protected activity." *Id.* at 327 (quoting *Burlington*, 548 U.S. at 68); *see also Rodgers*, 586 F. Supp. at 446. Title VII protects plaintiffs from only "retaliation that produces an injury or harm." *Burlington*, 548 U.S. at 67; *see also Gaines*, 657 F. Supp. 3d at 744.

"[E]stablishing a 'causal relationship' at the *prima facie* stage is not an onerous burden." *Strothers*, 895 F.3d at 335 (citations omitted). The plaintiff may do so either by establishing the existence of facts suggesting "that the adverse action occurred because of the protected activity[,]" or by demonstrating that "the adverse act bears sufficient temporal proximity to the protected activity." *Roberts v. Glenn Indus. Grp.*, 998 F.3d 111, 123 (4th Cir. 2021) (citations omitted); *see also Gaines*, 657 F. Supp. 3d at 745. If the plaintiff opts for the temporal proximity route, she

"simply" must show that "(1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Strothers*, 895 F.3d at 335–36; *see also Gaines*, 657 F. Supp. 3d at 745.

If the plaintiff "establish[es] a prima facie case of retaliation, the burden shifts to the [employer] to articulate a legitimate, non-retaliatory reason for the adverse employment action." *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 407 (4th Cir. 2005). "If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination." *Strothers*, 895 F.3d at 328 (quoting *Foster*, 787 F.3d at 250). "In order to carry this burden, a plaintiff must establish 'both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct.'" *Foster*, 787 F.3d at 252 (citation omitted); *see also Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation," which require "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."); *Foster*, 787 F.3d at 249 ("We conclude that the *McDonnell Douglas* framework, which already incorporates a but-for causation analysis, provides the appropriate standard for reviewing [a Title VII retaliation] claim.").

**1. September 2023 Final Written Warning and October 2023 Discharge**

Defendants concede that the September 2023 final written warning and the October 2023 discharge were materially adverse actions. ECF 27-1 at 18–19. As discussed above, *see* Part III.B *supra*, Plaintiff fails to demonstrate that Defendants' legitimate, non-discriminatory reasons for the September 2023 final written warning and the October 2023 discharge were pretextual. And

she cannot show that her reports about Ms. Spalt's allegedly discriminatory remarks were "the real reason" for the warning and termination. *Foster*, 787 F.3d at 252. The Court concludes that Defendants are entitled to summary judgment on Plaintiff's retaliation claims stemming from these actions.

**2. Administrative Suspension**

Plaintiff contends that her paid administrative suspension from September 16 to September 28, 2023, constitutes a materially adverse action sufficient to support a retaliation claim. ECF 1 ¶ 87.

Courts have come to differing conclusions as to whether a suspension or leave with pay is materially adverse for purposes of employment retaliation. *See West v. Noem*, Civ. No. JKB-23-01661, 2025 WL 896470, at *8 (D. Md. Mar. 24, 2025) (collecting cases). Brief suspensions with pay pending investigation, without any other adverse consequences, have been commonly held not to be materially adverse. *See, e.g.*, *Nzabandora v. Rectors & Visitors of Univ. of Va.*, 749 F. App'x 173, 175 (4th Cir. 2018) ("[Plaintiff's] placement on paid leave pending investigations into her alleged misconduct also does not constitute adverse employment action for purposes of Title VII."); *Mason v. Montgomery Cnty. Police Dep't*, No. 8:13-cv-01077-AW, 2013 WL 6585928, at *5 (D. Md. Dec. 13, 2013) ("[P]lacing an employee on paid administrative leave with full benefits is typically not considered a materially adverse action.") (collecting cases); *Jarvis v. Enterprise Fleet Servs. & Leasing Co.*, Civ. No. DKC-07–3385, 2010 WL 1068146, at *18 (D. Md. Mar. 17, 2010) (no adverse action based on two days of paid leave); *Grice v. Balt. Cnty.*, Civ. No. JFM-07-1701, 2008 WL 4849322, at *8 (D. Md. Nov. 5, 2008) (no adverse action based on a one-month paid suspension).

Cases in which courts have found paid suspension to be materially adverse have typically involved either a lengthy period of suspension or other specific adverse consequences. *See, e.g.*, *Doe v. Montgomery Cnty. Bd. of Educ.*, Civ. No. TDC-24-2810, 2025 WL 1135202 (D. Md. Apr. 17, 2025) (finding a materially adverse action for purposes of a retaliation claim where the circumstances of the paid leave included "an accusation that [the plaintiff] was mentally unfit to do her job and a requirement that she complete an [independent medical examination] relating to her mental health in order to return to work, both of which caused her 'stress'"); *West*, 2025 WL 896470 at *8 (finding materially adverse action to be plausible where plaintiff alleged that a "proposal to terminate" accompanied an eight-month paid suspension, which "is notably longer than the days-to-weeks long suspensions that have been held not to be materially adverse"); *Brown v. Hydrochem LLC*, No. 1:21-CV-02992, 2022 WL 1538622, at *1–2 (D. Md. May 16, 2022) (denying motion to dismiss retaliation claim where plaintiff alleged he was placed on a three-day paid suspension that was coupled with "fewer work hours" and "reduced earning opportunities" upon his return); *Hawkins v. Leggett*, 955 F. Supp. 2d 474, 488 (D. Md. 2013), *aff'd sub nom. In re Canarte*, 558 F. App'x 327 (4th Cir. 2014) (finding triable issue as to whether a "six-month placement on administrative leave" was materially adverse where plaintiff lost opportunities to earn overtime and holiday pay); *Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 441–42 (D. Md. 2012) (finding genuine dispute as to whether suspension with pay was materially adverse where it was accompanied by a "loss of prestige, privileges, and respect[,]" as plaintiff police officer "was no longer allowed to identify as a member of the [police] [d]epartment," and had his firearm and police badge taken).

Here, Plaintiff was suspended for only two weeks and was paid for the duration of the suspension. ECF 28-2 at 131:13–15. Plaintiff does not contend that her suspension resulted in

additional consequences that might "'dissuade[] a reasonable worker' from engaging in protected activity." *Strothers*, 895 F.3d at 327 (quoting *Burlington*, 548 U.S. at 68). Accordingly, the Court finds that the paid suspension was not a materially adverse action, and Plaintiff fails to make a prima facie case of retaliation based on the suspension.

**3. Failure to Take Seriously Ms. Spalt's Comments to Plaintiff**

Plaintiff alleges that Defendants retaliated against her by failing to take seriously her reports that Ms. Spalt made racially discriminatory comments to her during the rapid response events in September 2023. *See* ECF 1 ¶ 87. Even if a refusal to act in response to an employee complaint constitutes a materially adverse action, Plaintiff cannot show that Defendants failed to respond. There is no genuine dispute that HR investigated the September 2023 incident, including Plaintiff's allegation that Ms. Spalt made discriminatory comments to Plaintiff and Ms. Spalt's allegation that Plaintiff unjustifiably accused her of racism during the rapid responses. ECF 27-15 ¶¶ 12–17. Ultimately, HR "was unable to substantiate" both employees' allegations. *Id.* ¶ 17. Plaintiff fails to demonstrate that Defendants' reasons for declining to discipline Ms. Spalt were pretextual.

**4. Denying Plaintiff Military Leave**

Plaintiff alleges that Defendants' denial of her "military leave request for October 21, 2023" was a materially adverse action. ECF 1 ¶ 87. But Plaintiff was not denied leave. There is no genuine dispute on this point. Plaintiff sent an e-mail to Ms. Kidwell indicating that she would not be able to cover her shift on October 21 due to deployment, and Ms. Kidwell instructed Plaintiff to call the Administrative Coordinator when she was unable to come to work. ECF 28-28 at 6. Plaintiff called out for her shift on October 21, 2023, ECF 28-2 at 204:16–19, and was then removed from the work calendar, ECF 28-34 at 19:6–11.

### 5. Denying Plaintiff Access to Complete her DNP Project

Finally, Plaintiff alleges that Defendants retaliated against her for reporting discriminatory comments by Ms. Spalt by denying her access to the BHU to collect data for her doctoral project on October 21, 2023, and thereafter.

The Court finds a genuine dispute as to whether this action would "'dissuade[] a reasonable worker' from engaging in protected activity." *Strothers*, 895 F.3d at 327 (quoting *Burlington*, 548 U.S. at 68). Plaintiff testified that the denial caused a year-long delay in the completion of her graduate degree. ECF 28-2 at 252:13–15. Additionally, the temporal proximity between Plaintiff's complaints of racial discrimination against Ms. Spalt on September 16 and September 17, 2023, and in the denial of access to the BHU on October 21, 2023, is sufficient to support an inference of causation for purposes of a prima facie case.[4]

Although Plaintiff makes an adequate prima facie showing to support a presumption that Defendants' decision to deny her access to the BHU on October 21, 2023, was retaliatory, Plaintiff's retaliation claim fails for lack of evidence that Defendants' legitimate, non-discriminatory reasons for its action were pretextual.

As noted *supra*, Plaintiff was initially scheduled to work a shift on October 21, 2023, to begin at 7:00 p.m. ECF 28-2 at 204. Earlier that day, she contacted the Administrative Coordinator

---

[4] "While there is no bright-line rule, the Fourth Circuit has found that 'a time period of three to four months is too great to establish a causal link through temporal proximity alone,' but '[a] ten-week time period can be sufficient to establish a prima facie case of retaliation.'" *Bryant v. Mullin*, Civ. No. GLR-25-0057, 2026 WL 1408465, at *5 (D. Md. May 20, 2026) (quoting *Emami v. Bolden*, 241 F. Supp. 3d 673, 681 (E.D. Va. 2017)); *see also Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x. 229, 233 (4th Cir. 2006) (finding three- to four-month lapse between protected activities and termination "too long to establish a causal connection by temporal proximity alone"); *Silva v. Bowie State Univ.*, 172 F. App'x. 476, 478 (4th Cir. 2006) (finding that "ten-week lapse of time sufficiently established a prima facie case of retaliation"); *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (finding two-month-and-two-week period between protected activity and adverse action "sufficiently long so as to weaken significantly the inference of causation between the two events[,]" but "in the context of this particular employment situation, this length of time does not undercut the inference of causation enough to render [plaintiff's] prima facie claim unsuccessful").

for that shift, Ms. Baughman, to call out of work, *id.* at 204–05, and she was removed from the schedule, ECF 28-34 at 19:6–11. When Ms. Baughman learned that Plaintiff was planning on coming into the unit for her school project, she left Plaintiff a voicemail instructing her not to come. ECF 27-36; ECF 27-37 at 19:11–14. Ms. Baughman "did not feel it was appropriate [for Plaintiff] to do other work on the unit if [she was] unable to work any part of [her] shift[,]" and told Plaintiff that "she would need to come another day to complete her school assignment." ECF 27-36; ECF 27-37 at 19:17-21. With Plaintiff's absence from work, the BHU was short-staffed that evening, which posed safety risks and stressful conditions on the team working there, and made staff members unavailable for any interviews Plaintiff might conduct for her project. ECF 27-35 at 96:13–16. According to Ms. Baughman, "Plaintiff did not refuse but heavily debated" leaving the unit, arguing that she should be permitted to stay because her absence from work was excused by military mandate. ECF 27-36; ECF 27-37 at 19:21–20:2. Kimberly Finley, an employee who witnessed this interaction, characterized it as a "small incident" and noted that Plaintiff "was a little upset." ECF 28-9 at 10:8. 12:7.

About a month after her employment was terminated, the HR Director, Terry Olaguer, sent an email instructing Plaintiff that she was "not allowed back on the unit or in the organization" due to her "behavior towards team members and leaders." ECF 28-39. The email stated that "[t]his was a unilateral leadership decision." *Id.* During deposition, Mr. Olaguer explained that he sent the e-mail because Plaintiff had been reaching out to multiple people on the BHU requesting access; those individuals reported those attempts to Ms. Kidwell and Jennifer Redding, the leadership of the BHU; and Ms. Kidwell and Ms. Redding "did not want her coming back on the unit" after these reports. ECF 28-38 at 74:12–78:10.

Plaintiff has not presented evidence that the reasons offered for denying her access to the BHU during and after the October 2023 incident were false and that the true reason was retaliation for complaints about Ms. Spalt's allegedly discriminatory comments several weeks prior. *Foster*, 787 F.3d at 252.

Accordingly, the Court finds that Defendants are entitled to summary judgment on all of Plaintiff's Title VII and MFEPA retaliation claims.

**D. USERRA**

In Counts V and VI of the Complaint, Plaintiff alleges that Defendants violated USERRA by terminating her employment based on her status as a military service member and her protected activity. Defendants argue that Plaintiff's USERRA claims fail because she was granted the military leave that she requested. ECF 27-1 at 23–24. They also contend that Plaintiff was terminated not because she took time off for military service, but because she returned to the BHU to conduct her DNP project after calling off from her work shift and being instructed not to come onto the unit. *Id.* at 24–25. Even if Plaintiff establishes that her status as a service member or her exercise of rights under USERRA was a factor leading to her termination, Defendants assert that they are entitled to summary judgment because, given that she had previously been issued a final warning, she would have been terminated regardless. *Id.* at 25–26.

Plaintiff argues that that summary judgment is precluded by disputes over "how Defendants treated Plaintiff's military obligations," and "Defendants' rapid progression to termination" following her return from active duty. ECF 28 at 26. She further argues that "a reasonable jury could conclude that Defendants improperly used her military service as a factor in their decision-making." *Id.*

"USERRA prohibits discrimination against persons because of their service in the uniformed services." *Kitlinkski v. U.S. Dep't of Just.*, 994 F.3d 224, 229 (4th Cir. 2021) (quoting

*Butts v. Prince William Cnty. Sch. Bd.*, 844 F.3d 424, 430 (4th Cir. 2016)) (internal quotation marks and brackets omitted). As USERRA "was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries." *Hill v. Michelin N. Am., Inc.*, 252 F.3d 307, 312–13 (4th Cir. 2001).

The first part of USERRA's anti-discrimination provision "broadly prohibits discrimination in the hiring, rehiring, and retaining of servicemembers." *Id.* (quoting *Harwood v. Am. Airlines, Inc.*, 963 F.3d 408, 414 (4th Cir. 2020)); *see also* 38 U.S.C. § 4311(a). To establish discrimination in violation of § 4311(a), a plaintiff must demonstrate "(1) that [her] employer took an adverse employment action against [her]; (2) that [she] had performed, applied to perform, or had an obligation to perform as a member in a uniformed service; and (3) that the employer's adverse action was taken 'on the basis of' that service, such that the service was 'a motivating factor' in the action." *Harwood*, 963 F.3d at 414–15 (quoting 38 U.S.C. § 4311(a), (c)).

The second part of USERRA's anti-discrimination provision "prohibits employers from "tak[ing] any adverse employment action against any person because such person has taken an action to enforce a protection afforded any person under [USERRA], . . . or has exercised a right provided for in [USERRA]." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006) (alterations in original) (quoting 38 U.S.C. § 4311(b)). To establish retaliation under § 4311(b), a plaintiff must demonstrate that "(1) the employee engaged in protected activity under USERRA, and (2) that protected activity was 'a motivating factor in the employer's action.'" *Kitlinkski*, 994 F.3d at 229 (quoting 38 U.S.C. § 4311(c)(2)). To prove that the service or protected activity was a "motivating factor," the plaintiff "need not show that it was the sole cause of the employment action, but rather that it is one of the factors that a truthful employer would list if asked for the reasons for its decision." *Washington v. Coastal Int'l Sec.*, Civ. No. DKC 14-0331,

2015 WL 4396616, at *7 (D. Md. July 16, 2015) (quoting *Bunting v. Town of Ocean City*, 409 F. App'x 693, 695–96 (4th Cir. 2011)).

Plaintiff's USERRA claims fail as a matter of law because she fails to identify any evidence indicating that her status as a military service member or her military leave in October 2023 were "motivating factors" in her termination. On October 18 and October 19, 2023, Plaintiff sent e-mails to her supervisor indicating that she would be unable to work her shift scheduled for October 21, 2023, because of her military deployment that week. ECF 28-28. The supervisor instructed Plaintiff to call the Administrative Coordinator when she could not come to work. *Id.* Notably, Plaintiff's military orders during this period provided for activity duty ending on October 20.[5] ECF 27-31. Defendants had scheduled Plaintiff to work on October 21, satisfying their obligation to reemploy Plaintiff upon completion of her service. It was not until Plaintiff contacted Ms. Baughman, the Administrative Coordinator, to call out of her scheduled work shift that evening that she was removed from the work schedule. *See* ECF 28-2 at 204–05; ECF 28-34 at 19:6–11. The next day, on October 22, Plaintiff was asked to provide an updated military order because the order that she sent indicated that her service lasted until October 20—not October 21. ECF 28-28.

Plaintiff was allowed to take October 21 off despite the discrepancy between her request and her military orders. After being removed from the schedule and being instructed not to come into the BHU on that date, Plaintiff did so anyway. ECF 28-2 at 204:16–19; ECF 27-36. That conduct, in combination with the previous final written warning she received in September 2023, was Defendants' basis for terminating Plaintiff's employment. Plaintiff fails to present any

[5] The military orders were later modified to include an "additional day" for travel time, ECF 28-31, but Plaintiff had already been terminated by that point—and for reasons unrelated to her military service, as explained herein.

evidence that her military status or deployment affected this determination. Thus, the Court finds that Defendants are entitled to summary judgment on Plaintiff's USERRA claims.

**E. Breach of Contract**

In Count VII of the Complaint, Plaintiff alleges that Defendants breached a contract between the parties in which Defendants agreed to allow Plaintiff access to the BHU and its employees to collect data in connection with her doctoral program. ECF 1 ¶ 127. Plaintiff alleges that Defendants breached the contract by denying and restricting her access to the BHU. *Id.* ¶ 128.

Defendants contend that no contract exists between the parties. ECF 27-1 at 26–27. They argue that the approval form for Plaintiff's DNP project lacked consideration and did not contain a precise offer nor unconditional acceptance. *Id.* They also argue that Plaintiff admitted that the agreement was not a contract and more "like a form" during her deposition. *Id.* (citing ECF 27-4 at 255:7). Defendants point out that the only signatories to the approval form were Danielle M. Michalak, a senior nurse, and Kristen Rawlett, a faculty member of the University of Maryland School of Nursing. ECF 29 at 13. According to Defendants, Plaintiff may not enforce the contract because she did not argue that she is a third-party beneficiary to the contract. *Id.*

Plaintiff argues that consideration supported the contract because the DNP project was designed to improve the quality of operations and patient care in the BHU. ECF 28 at 27–28. She further posits that the offer contained definite terms about the implementation of the project and that the signatures on the approval form constituted acceptance. *Id.*

To establish a breach of contract under Maryland law, a plaintiff must show "a contractual obligation owed by the defendant to the plaintiff and a material breach of that obligation." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 600 (D. Md. 2015) (citing *RRC Ne., LLC v. BAA Md., Inc.*, 994 A.2d 430, 442 (Md. 2010)). "The formation of a contract requires mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient

consideration." *CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392 F.3d 114, 123 (4th Cir. 2004) (citing *Peer v. First Federal Sav. & Loan Ass'n of Cumberland,* 331 A.2d 299, 301 (Md. 1975)). "Consideration requires a bargained-for-exchange[,]" which "by definition requires each side to give the other something of value. When one side can avoid all of its obligations, the agreement lacks the kind of basic reciprocity that is necessary to form a contract." *Johnson v. Cont'l Fin. Co.*, 131 F.4th 169, 178 (4th Cir. 2025) (citation omitted).

The Approval of Doctor of Nursing Practice ("DNP") Project Proposal for Implementation form reads as follows:

> The University of Maryland Baltimore (UMB) Human Research Protections Office (HRPO) reviewed this DNP project and determined it to be a quality improvement project (determination document attached). The institution named above does not have an established HRPO or Institutional Review Board (IRB) for evaluation of quality improvement projects, but has identified an Institution Reviewer as an agent of the institution who can give approval of such projects. The Institution Reviewer has read and fully understands the scope of this University of Maryland School of Nursing DNP project and concurs with the determination of the project as quality improvement by the UMB IRB. The signature below indicates full approval of the institution for the student to implement the Doctor of Nursing Practice Project at the above named institution.

ECF 27-28; ECF 28-5. The "above named institution" is University of Maryland School of Nursing. *Id.* The form is signed only by a senior nurse at HMH and a School of Nursing faculty member.

The approval form is not a contract. Even Plaintiff took that position during her deposition. ECF 27-4 at 255. By its terms, the document merely grants "approval" to Plaintiff's DNP project as "a quality improvement project" and authorization for Plaintiff to implement the project at

University of Maryland School of Nursing. The operative language is permissive and authorizing. It does not impose any clear or definite obligations on Defendants, nor specify what benefits Defendants would gain for accepting those obligations. Without a clear and definite obligation on Defendants, Plaintiff cannot establish a breach. Indeed, Plaintiff fails to identify what term of the approval form Defendants breached by denying Plaintiff access to the BHU on October 21, 2023, and after the termination of her employment. The Court concludes that Defendants are entitled to summary judgment on Plaintiff's breach of contract claim. *See Stewart v. Morgan State Univ.*, 46 F. Supp. 3d 590, 601 (D. Md. 2014), *aff'd*, 606 F. App'x 48 (4th Cir. 2015) (granting defendants summary judgment where the agreement at issue "does not address any consideration or obligations owed by [Defendants]" and "only mentions benefits that Plaintiff would receive from his own research efforts").

**F. Spoliation**

Plaintiff argues that Defendants should be denied summary judgment due to their potential spoliation of video evidence relevant to Plaintiff's claims. ECF 28 at 28–30. Specifically, Plaintiff contends that Defendants failed to preserve video footage of the interaction between her and Ms. Spalt during the rapid response events on September 16, 2023. *Id.* During discovery, Defendants advised Plaintiff that the video footage was "retained for 30 days and was over-written pursuant to Defendants' policy prior to notice of any legal claim and obligation to preserve footage." ECF 28-7 at 5. Plaintiff contends that Defendant was on notice to preserve the video as of September 2023 because of the final written warning issued to Plaintiff and the specific request Plaintiff made to view the video during the investigation of the incident. ECF 28 at 29–30. She argues that because the video was within Defendants' exclusive control, a reasonable jury should infer that the video was unfavorable to Defendants, which defeats summary judgment. *Id.* at 30.

Defendants argue that there was no reason to anticipate litigation until Defendants received notice of Plaintiff's filing of charges with the EEOC, in March 2024. ECF 29 at 13–14. They contend that, pursuant to internal policy, the video footage from the September 16, 2023, incident was overwritten 30 days later, on or around October 15, 2023—well before they received notice of litigation. *Id.*

Spoliation refers to "the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001). "Generally, it is the filing of a lawsuit that triggers the duty to preserve evidence." *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013). But the duty "extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri*, 271 F.3d at 591 (citation omitted); *see also Jennings v. Frostburg State Univ.*, 679 F. Supp. 3d 240, 291 (D. Md. 2023). "[T]he mere existence of a dispute does not necessarily mean that parties should reasonably anticipate litigation." *Jennings*, 679 F. Supp. 3d at 292 (citation omitted). Rather, the duty to preserve "begins 'somewhere between knowledge of the dispute and direct, specific threats of litigation.'" *Id.* (quoting *Huggins v. Prince George's County*, 750 F. Supp. 2d 549, 560 (D. Md. 2010)). A non-exhaustive list of examples of events triggering the duty to preserve include "the receipt of a demand letter, a request for evidence preservation, a threat of litigation, or a decision to pursue a claim[.]" *Id.* (quoting *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 106 (E.D. Va. 2018)).

Plaintiff cites no authority to support the proposition that her request to see the video of her interaction with Ms. Spalt and the final warning issued to her in September triggered a duty to preserve. Plaintiff did not issue any demand letter to Defendants, request preservation of the video, or threaten litigation at any point before the video was over-written in the normal course of

Defendants' business. In the grievance she submitted to HR in September 2023, Plaintiff alleged that video footage would show that she was not on her phone when Ms. Spalt confronted her, but the grievance contains no request for preservation or threat of litigation. *See* ECF 28-18. The disciplinary action and any request Plaintiff made to view the video footage could not, by themselves, make litigation reasonably foreseeable. The case upon which Plaintiff relies in her opposition indicates, contrary to her position, that the duty to preserve began when Defendants learned about Plaintiff's filing with the EEOC. *See Membreno*, 338 F.R.D. at 72 (concluding that the defendants "should have reasonably anticipated litigation . . . when they received notice of" the plaintiff's filing with the EEOC). Here, Plaintiff did not file a charge with the EEOC until March 2024, long after the video footage at issue would have been over-written in the normal course. Thus, Plaintiff fails to establish any entitlement to relief based on spoliation of evidence.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment (ECF No. 27). A separate Order will issue.

September 25, 2026
Date

Matthew J. Maddox
United States District Judge